# In the United States District Court for the Southern District of Georgia Brunswick Division

LOGISTEC USA, INC.,

 Plaintiff,

 vs.

DAEWOO INTERNATIONAL
CORPORATION, and DAEWOO
INTERNATIONAL (AMERICA)
CORPORATION,

 Defendants.

CV 213-027

## ORDER

 Does the term "truck tipper" include cargo-receiving equipment that can only tip and dump the contents of a semi-trailer detached from its cab, or does that term refer specifically to such equipment capable of tipping a fully connected rig? That is a central issue in Plaintiff Logistec USA Inc.'s ("Logistec") and Defendant Daewoo International Corporation's ("Daewoo") cross motions for summary judgment on Logistec's breach of contract and related claims against Daewoo. See Dkt. nos. 54, 57. Logistec has also filed a Motion to Strike Witness Charles Bell, Dkt. no. 61, whom Daewoo presented as an expert on the use of truck tippers in the woodchip industry. The

1

Court finds that both parties contemplated a tipper capable of tipping a trailer attached to its cab when the contract was executed, and that Logistec's provision of a trailer-only tipper constitutes a breach of its obligation to provide a "truck tipper." However, there is a genuine dispute of material fact in whether this breach amounts to a material breach that would allow Daewoo to rescind the contract. Thus, both parties' motions for summary judgment on Counts I and IV are **DENIED**, along with Daewoo's motion for summary judgment on Count V. Daewoo's motion for summary judgment on Count II is **GRANTED**. For reasons stated below, Logistec's Motion to Strike Witness Charles Bell is **GRANTED**.

## PROCEDURAL BACKGROUND

Logistec filed a complaint against Defendants Daewoo International ("Daewoo") and Daewoo International (America) Corporation ("Daewoo America"), in which Logistec sought both damages and equitable relief. See Dkt. no. 1. Logistec asserted claims against both defendants for: (I) breach of contract, (II) promissory estoppel, (III) equitable estoppel, (IV) breach of good faith and fair dealing, and (V) attorney's fees. Id. The Court granted Logistec's Motion for Voluntary Dismissal for Counts I, III, and IV against Daewoo America (See Dkt. no. 48), leaving only Counts II and V pending against Daewoo America. The Court subsequently granted Daewoo America's Motion for Summary

Judgment as to these two remaining claims. See Dkt. no. 83. The Court also granted Logistec's Motion for Voluntary Dismissal as to Count III against Daewoo. See Dkt. no. 75. Thus, the only remaining claims at this stage of the litigation are Counts I, II, IV, and V pending against Daewoo.

Daewoo has filed a motion for summary judgment as to all four remaining claims. Dkt. no. 54. Logistec has filed cross motions for summary judgment for Counts I and IV. Dkt. no. 57.

## FACTUAL BACKGROUND

Logistec is a logistics and stevedoring company that operates terminal facilities throughout the world, including a facility at the Port of Brunswick. Dkt. no. 59, ¶ 1. Daewoo is a Korean company engaged in international trading and often transacts business through one of its American subsidiaries, Daewoo America. Id. at ¶ 3.

In June of 2012, the two companies signed a contract (the "Agreement") in which Daewoo would deliver woodchips in bulk to Logistec, who in turn would receive and store them. Dkt. no. 1-1, ¶ 2.03. The Agreement required Logistec to "furnish and maintain . . . equipment, land, and other facilities . . . as may be necessary to receive and store up to 50,000 metric tons of the Product." Id. at ¶ 2.04. An appendix to the Agreement includes a "[t]ruck tipper to receive cargo" among the pieces of

AO 72A
(Rev. 8/82)

equipment that Logistec was required to obtain. Id., Appendix A, at I.b. The Agreement does not define the term "truck tipper."

The Agreement further contemplated that Logistec would invest significant capital expenditures for the facility and equipment needed to ship the large volume of woodchips through Logistec's terminal. See Dkt. no. 41, "Corrigan Dep." 50:13-23. In fact, after the Agreement was signed, Logistec spent approximately $2,500,000 preparing its Brunswick port terminal for Daewoo's delivery of the woodchips.

While the parties entered into the Agreement on June 12 and 13 of 2012, Dkt. no. 1-1, p. 12, discussions regarding the tipper began as early as January 19, 2012. Logistec's representatives to the negotiations included Frank Vannelli, Logistec's Vice President for Sales, Market, and Business Development, and Jay Baird, Logistec's Manager of US Sales and Marketing. Dkt. no. 42, "Vannelli Dep." 35:4-10. Because Daewoo is based in Korea, it relied on agents from Daewoo America to participate in negotiations, and they included Jong Bae and Sugu Thuraisamy, along with the telephonic participation of Hyu Yang Han, Manager of Raw Materials Team IV for Daewoo, from Korea. See id. at 27:18-25. At all relevant times, Vannelli was authorized to represent Logistec and Thuraisamy was authorized to represent Daewoo in connection with the negotiations leading up to the Agreement. Vannelli Dep. 35:10-15; Dkt. no. 59-3,

AO 72A
(Rev. 8/82)

"Thuraisamy Dep." 58:4-59:9. The discussions leading up to the Agreement were Daewoo's first venture into the woodchip industry, and were also Thuraisamy's first efforts to negotiate a procurement of woodchips for Daewoo. Dkt. no. 37-3, "Jong Bae Dep." 29:10-24; Thuraisamy Dep. 40:2-16.

The earliest documented discussion of tippers occurred on January 19, 2012, when Thuraisamy emailed Vannelli regarding procurement of the tippers: "In our opinion it would be best to have two semi-portables as a starting point and trade one of the semi-portables back to the company when they put in the permanent." Dkt. No. 44-6. Vannelli responded by stating:

> Very valid point on the semi-portables and we did consider however we feel that it negatively impacts the efficiency of the operation as you need to disconnect the cab from the main rig to unload and then re-hook cab to rig for exit from the port area. We calculate it takes 3 times as long to turn the trucks thus dramatically increasing truck waiting time and also impacts congestion and productivity.

Id. On April 10, Vannelli reinforced to Thuraisamy Logistec's position that "we too have no interest in loss time or lack of productivity in turning trucks." Dkt. no. 44-9. Neither party disputes that Vannelli never notified Daewoo that its opinion on the necessary type of tipper had changed before the parties entered the Agreement on June 12 and 13, 2012. Vannelli Dep. 46:23-47:10.

AO 72A
(Rev. 8/82)

While these conversations were ongoing during the months leading up to the Agreement, Logistec shopped the market for various types of tippers in anticipation of obtaining a signed Agreement with Daewoo. Particularly, Logistec advised Daewoo of the necessary lead time to get a tipper (6-9 months), and that getting a tipper was currently a priority for several companies within the industry. Dkt. no. 59-7, pp. 4-5. Logistec, concerned about the necessary lead time to obtain a tipper, also advised Daewoo that it could not purchase any equipment until it had a signed Agreement, and that delays in executing the Agreement could potentially cause delays in procuring a tipper. Dkt. no. 59-8, p. 1.

During the negotiations, Logistec allocated $2.6 million for equipment outlays necessary for the anticipated Agreement with Daewoo. This budget included the cost of obtaining a tipper. Dkt. no. 43, "Proctor Dep." 22:7-23. David Proctor, who was tasked with obtaining a tipper for Logistec, says he was simply told to get a "truck tipper." Proctor Dep. 41:1-5. After it became apparent that tippers were in high demand and short supply, Logistec considered all kinds of tippers because getting a tipper was "mission critical." Vannelli Dep. 54:20; Dkt. no. 44-5, p. 2. In fact, Vannelli recalls that tippers during that time were hard to come by because the woodchip industry was turning into a "gold rush." Vannelli Dep. 51:10-15.

AO 72A
(Rev. 8/82)

On April 9, Vannelli emailed Thuraisamy to inform him that a tipper had not yet been procured, but that a temporary solution would be provided if necessary. Dkt. no. 44-8, p. 2. Vannelli again reiterated Logistec's position that it did not want to purchase a tipper until the Agreement had been signed. Vannelli Dep. 176:4-23.

On July 6, 2012, nearly a month after both parties had signed the Agreement, Vannelli emailed the Daewoo team to inform them that Logistec had purchased a "truck tipper" which would be installed and ready for use by October 1. Dkt. no 44-11. In fact, Proctor had purchased a "trailer dumper," Phelps Model A245RP63, which was capable of unloading up to four trailers in one hour. Proctor Dep. 21:13-21; 93:23-25. However, this model of tipper required the cab to be disconnected from the truck before the trailer could be tipped. Dkt. no. 44-13; Proctor Dep. 32:5-8.

After Logistec obtained its tipper, Vannelli asked Baird, who had also participated in the negotiations, whether the tipper required the trailer to be unhooked and expressed concern that, if that was the case, there could be a problem with the tipper. Dkt. no. 44-13. After Vannelli learned that Logistec had acquired a tipper that required detachment, Vannelli did not tell Daewoo that the tipper it procured would not tip a trailer attached to a truck because "all that [Logistec] had in our

Agreement was that [they] would have a suitable truck tipper to handle the project." Vannelli Dep. 72:8-16.

Logistec did not disclose to Daewoo that the tipper they had purchased required detachment until July 18, 2012. Dkt no. 44-13. Later in an email to Vannelli, Thuraisamy explained that the change had taken Daewoo "completely off guard," and that they were "very concerned" over using this type of tipper. Dkt. no. 44-14, p. 2. Thuraisamy explained his belief that this tipper was not adequate, and that the change was not consistent with the negotiations to the Agreement. Id.

On July 19, Vannelli addressed the fallout surrounding the tipper situation to Baird, and opined that Thuraisamy "is right as they always wanted a truck tipper where no time would be lost detaching and reattaching the cab." Vannelli Dep. 84:19-85:3. On July 25, Vannelli expressed similar sentiments to the Logistec Vice President Rodney Corriga, stating:

> Daewoo is concerned as they talk to truckers and because of the competition for the wood chip basket, which is anywhere from 10 to 12 million short tons in southeast to serve wood, pulp and pellet manufacturer needs as well as wood chip exporters that we at Brunswick would be put at a disadvantage as everywhere else in the southeast they have drive-through truck tippers.

Dkt. 44-16.

Both parties have presented testimony from their employees, agents, and third-party experts as to the efficiency and safety

AO 72A
(Rev. 8/82)

of using detached tippers as opposed to connected tippers in an operation like one contemplated under the Agreement. Han, from Daewoo, offered his opinion that tippers like the one purchased by Logistec are not as effective as those that tip the entire truck, and that suppliers would not want to work with Daewoo if it meant that they had to use this type of tipper. Dkt. no. 37-4, "Han Dep." 27:15-28:6. Daewoo also presented the affidavit of Charles Bell, whom Daewoo portrays as an expert in the woodchipping industry. Bell states in his affidavit that truckers prefer to haul woodchips to facilities that have tippers that does not require detachment instead of trailer-only tippers, that trailer-only tippers present significant safety issues to truck drivers, and that "virtually all" of the major port/mill facilities from Savannah, Georgia to Southeast Georgia use non-detaching tippers as opposed to trailer-only tippers. Dkt. no. 55-4, ¶¶ 7-9.

For its part, Logistec insists that the tipper it purchased can adequately satisfy the demands of the Agreement. Vannelli is confident that the equipment at Logistec's facility can handle the job. Vannelli Dep. 85:4-13, 92:11-16. Logistec's expert witness, Robert Mantrop, testified that Logistec's tipper is "entirely suitable" to meet the demands of the Agreement. Dkt. no. 59-14, "Mantrop Aff." ¶ 15. Logistec even offered Daewoo the opportunity to verify the tipper's ability to perform according

AO 72A
(Rev. 8/82)

to the Agreement, but Daewoo never agreed to test the equipment. Thuraisamy Dep. 229:3-22. Furthermore, Logistec eventually performed its own test runs, on August 27 and September 24, 2013, to confirm the operational aspects of its equipment. See Dkt. no. 59-2, "Spivey Dep." pp. 41-79.

The disagreement over the tipper ultimately doomed the entire Agreement—at least ostensibly. Daewoo maintains that Logistec's alleged breach in procuring the wrong kind of tipper caused the deal's undoing. Logistec counters that the dispute over the tipper is merely a pretext, and that Daewoo in fact backed out of the deal after it learned it had grossly miscalculated its cost projections for exporting woodchips through the Port of Brunswick, and later discovered that exporting woodchips through another port would be more economically favorable.

Unbeknownst to Logistec, Daewoo had begun negotiations with Cemex Construction Materials Florida, LLC ("Cemex"), one of Logistec's competitors based in Jacksonville, Florida, for port terminal services at the Port of Jacksonville to deliver woodchips at the same time it was negotiating with Logistec. Dkt. no. 37-3, "Jong Bae Dep." 125:7-126:6, 143:1-4. Logistec's industry expert, Mantrop, stated that he had a conversation with Thuraisamy in the Fall of 2012 regarding Daewoo's plan to export woodchips. During the course of their conversation, Mantrop says

10

it became "very clear" to him that Daewoo had not established a supplier for woodchips through Logistec's Brunswick facility, and that Daewoo did not understand how to "accurately project costs." Mantrop Aff. ¶ 7. Furthermore, Mantrop claims that Thuraisamy later told him that Daewoo would use the dispute over the tipper as an "excuse to back out of the Logistec contract and obtain more favorable market prices in Jacksonville, Florida." Id. at ¶ 8. Thuraisamy retorts that he would never share the details of Daewoo's business with Mantrop, who works for Daewoo's competitor Cogent Fiber, and that he never said or implied that Daewoo used the tipper issue as an "excuse" to take its woodchip operations to Jacksonville. Dkt. no. 68-1, "Thuraisamy Decl." ¶¶ 5-6, 8.

Regardless of its reasons, Daewoo never delivered a single woodchip to Logistec's facility in October of 2012, or at any time thereafter. Thuraisamy Dep. 161:23-25. Instead, Daewoo delivered its woodchips elsewhere. Thuraisamy Dep., Dkt. no. 59-26. Daewoo notified Logistec of its decision to rescind the contract on November 26, 2012, Dkt. 59-18, p. 2, and officially terminated the Agreement on January 25, 2013. Dkt. no. 59-20.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

AO 72A
(Rev. 8/82)

P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

When, as here, the parties have both filed motions for summary judgment, the applicable Rule 56 standard is not affected. See Gerling Global Reinsurance Corp. of Am. v. Gallagher, 267 F.3d 1228, 1233 (11th Cir. 2001). "[T]he facts

are viewed in the light most favorable to the non-moving party on each motion." Chavez v. Mercantil Commercebank, N.A., 701 F.3d 896, 899 (11th Cir. 2012).

## DISCUSION

Both parties argue that they are entitled to summary judgment as a matter of law on the Count I breach of contract claim. Logistec argues that Daewoo did not have a valid excuse to back out of the Agreement it had with Logistec, while Daewoo argues that Logistec's failure to provide a tipper that does not require detachment constitutes its own breach and excuses Daewoo's non-performance. At the summary judgment stage, the Court will consider all of the evidence, including expert testimony, that may bear on the conclusion of whether Daewoo or Logistec breached the Agreement. As an initial matter, then, the Court must first consider Logistec's motion to strike the affidavit of Daewoo's witness Charles Bell. Then the Court will consider the more central question of whether Logistec's provision of a trailer-only tipper satisfies the Agreement between the parties and, if not, whether the breach is material and justifies Daewoo's rescission.

## I. Motion to Strike

Daewoo served its Rule 26(a)(2) disclosures to Logistec on October 1, 2013. Dkt. no. 61-1. The disclosure listed Charles Bell as a Rule 26(a)(2)(C) hybrid/mixed fact and expert witness.

The Disclosure did not include a Rule 26(a)(2)(B) written expert report, and did not include any factual basis for Charles Bell's personal knowledge as to the parties, the Agreement, or any interactions between them. In fact, Daewoo later admitted in Logistec's Request for Admissions that "prior to January 25, 2013, no representative or agent of [Daewoo] ever communicated in any way with Charles Bell." Dkt. no. 61-3, pp. 7-8.

Daewoo attempts to save Bell's testimony by arguing that if his testimony is not admissible as expert testimony under Federal Rule of Evidence 702, it should be permitted as non-expert testimony under Rule 701.

Rule 701 states:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a)  Rationally based on the witness's perception
(b)  Helpful to clearly understand the witness's testimony or to determine a fact in issue; and
(c)  Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. In his affidavit, Bell proffers his opinion regarding the differences between "truck" tippers and "trailer" tippers, safety concerns regarding trailer-only tippers, and the efficiency of non-detaching tippers as opposed to trailer-only tippers. Such conclusions are not merely based on his perception, but instead are based on his "specialized knowledge" of having been a truck dispatcher since 1987. Bell Aff. ¶ 2. The

14

conclusion that some tippers are more safe or efficient than others is one that can only come from specialized knowledge of the field—a layman would not draw such conclusions merely by observing a tipper in action. Therefore, Bell's affidavit is not permitted under Rule 701.

Neither is Bell's testimony permissible under Rule 702. Under Rule 26(a)(2)(A) and (B), "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705," and that disclosure must be accompanied by a written report detailing the witness's opinions, the bases for those opinions, the facts and data considered, and the witness's qualifications. Fed. R. Civ. P. 26(a)(2). The Eleventh Circuit has interpreted this requirement to mean that a Rule 26(a)(2)(B) written report must accompany disclosures unless the witness has "personal knowledge" of the facts of the case. See Prieto v. Malgor, 361 F.3d 1313, 1318-19 (11th Cir. 2004). Because Daewoo failed to file a Rule 26(a)(2)(B) report with its declaration of witness Bell, who Daewoo admitted did not have personal knowledge of the case, Bell's testimony is **STRIKEN**.

## II.  **Motions for Summary Judgment**

At the outset of this analysis, the Court notes that both parties agree that Georgia law governs the Agreement. See Dkt. no. 1-1, ¶ 12.02 ("This agreement and all questions relating to

its validity, interpretation, performance and enforcement . . . shall be governed by and construed in accordance with the laws of the state of Georgia . . .").

## A. Construction of the Contract

Construction of the contract is a question of law for the court. Ga. Code Ann. § 13-2-1. "The cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction." § 13-2-3. Because contract interpretation is a matter of law for the court, "contract disputes are particularly well suited for adjudication by summary judgment." Michna v. Blue Cross & Blue Shield of Ga., Inc., 653 S.E.2d 377, 379 (Ga. Ct. App. 2007).

Georgia courts apply a three step analysis in interpreting contracts: (1) the trial court first decides whether the language of the contract is ambiguous; (2) if the language is ambiguous, the court must then apply the applicable rules of construction found in Georgia Code Annotated § 13-2-2; (3) if any ambiguity remains, the court presents the question to a jury. Travelers Ins. Co. v. Blakey, 349 S.E.2d 474, 476 (Ga. Ct. App. 1986).

AO 72A
(Rev. 8/82)

### i. Determining Ambiguity

A contract is ambiguous if it is susceptible to more than one meaning, "even if each meaning is logical and reasonable." Michna, 653 S.E.2d at 379. The court limits this initial inspection for ambiguity to the contract itself, and extrinsic evidence will not produce ambiguity out of unambiguous language. See id.

Here, Daewoo claims that the term "truck tipper" unambiguously means a tipper capable of tipping a fully connected truck rig, while Logistec argues that the term unambiguously means any piece of equipment that tips any part of a truck. Nevertheless, this Agreement contemplates several procedures, commodities, and pieces of equipment, including the tipper, that are rarely mentioned in ordinary conversation, and are generally only discussed within a specific industry that has its own parlance. Both parties have presented reasonable, conflicting definitions of the term. While the parties' argument over the definition of "truck tipper" does not, in and of itself, automatically make that term ambiguous, the fact that both suggested definitions are "logical and reasonable" while also being mutually incompatible does. See, e.g., id. at 379 ("when a provision in a policy is susceptible to more than one meaning, even if each meaning is logical and reasonable, that provision is ambiguous."). Thus, the Court finds that the term

AO 72A
(Rev. 8/82)

"truck tipper," as used in this Agreement, is ambiguous, and proceeds by applying Georgia's statutory rules of construction.

## ii. Applying the Statutory Rules of Construction

By statute, Georgia law requires that the following rules, "among others," be used in arriving at the true interpretation of contracts:

(1) Parol evidence is inadmissible to add to, take from, or vary a written contract. All the attendant and surrounding circumstances may be proved and, if there is an ambiguity, latent or patent, it may be explained; so, if only a part of a contract is reduced to writing (such as a note given in pursuance of a contract) and it is manifest that the writing was not intended to speak the whole contract, then parol evidence is admissible;

(2) Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning. The local usage or understanding of a word may be proved in order to arrive at the meaning intended by the parties;

(3) The custom of any business or trade shall be binding only when it is of such universal practice as to justify the conclusion that it became, by implication, a part of the contract, except in regard to those transactions covered by Title 11;

(4) The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part;

(5) If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred;

AO 72A
(Rev. 8/82)

Ga. Code Ann. § 13-2-2(1)-(5) (continuing on with four additional rules that are plainly inapplicable to the case at hand). Other rules courts may consider in interpreting contract terms include "the cardinal rule of construction," which is "to ascertain the intention of the parties." Ga. Code Ann. § 13-2-3. Also, where the intentions of the parties differ, "the meaning placed on the contract by one party and known to be thus understood by the other party at the time shall be held as the true meaning." Ga. Code Ann. § 13-2-4.

The Court's analysis will begin with the "cardinal rule" of determining the intention of the parties. See § 13-2-3.

> It is the parties' intent at the time the contract is made that governs; if the language of a contract may be understood fairly in more than one way, it should be construed to reflect the sense in which the parties themselves understood it at the time of execution. Extrinsic evidence is admissible to establish that understanding.

Dooley v. Dun & Bradstreet Software Servs., Inc., 483 S.E.2d 308, 310 (Ga. Ct. App. 1997). The language of the contract may be understood fairly in more than one way: given the specialized context of the Agreement, "truck tipper" could mean a piece of machinery that literally tips a whole truck, or a piece of machinery that accomplishes similar ends by tipping only the trailer. In this case, discovery produced an abundance of evidence demonstrating the parties' intent as to the term "truck tipper" at the time of execution.

AO 72A
(Rev. 8/82)

Particularly, as early as January 19, 2012, Vannelli represented to Thuraisamy that having a tipper that could not tip the whole truck would "negatively impact[] the efficiency of the operation . . . We calculate it takes 3 times as long to turn the trucks thus dramatically increasing truck waiting time and also impact[ing] congestion and productivity." On April 10, Vannelli reinforced to Thuraisamy that Logistec had "no interest in lost time or lack of productivity in turning trucks." It is undisputed that Vannelli never notified Daewoo or its agents that Logistec had changed its opinion on the efficiency of trailer-only tippers before the parties entered into the Agreement on June 12 and 13. Vannelli Dep. 46:23-47:10.

The earliest indication in the record of when Logistec began considering trailer-only tippers was on July 6, when Vannelli informed Thuraisamy that it had purchased a tipper that would be ready for use in October. Dkt. no 44-11. While it is feasible that Logistec or its agents contemplated purchasing a tipper that tips only the trailer *before* executing the Agreement, this possibility seems unlikely. Vannelli inquired with Baird on July 10, 2012, *after* the Agreement had already been signed, asking what type of tipper Logistec had purchased ("If we have one where trucker needs to hook and unhook then YES I think speed on turn time will be a problem."). Dkt. no. 44-13, p. 1. If Vannelli, Logistec's point-man in the negotiations, was

AO 72A
(Rev. 8/82)

not aware that Logistec had purchased a trailer-only tipper after the Agreement was signed and, in fact, still held the opinion that such a tipper would be inefficient, it is a fair inference that Logistec as an organization intended the term "truck tipper" to mean a tipper that does not require unhooking the trailer when it signed the Agreement on June 12.

Thus, Georgia's cardinal rule of statutory construction leads to the conclusion that both parties intended, at the time the contract was signed, the term "truck tipper" to mean a piece of machinery that could tip a truck along with its attached trailer, and not a piece of machinery that could only tip a detached trailer.

But even if Daewoo's understanding that "truck tipper" excluded trailer-only tippers was not shared by Logistec, Daewoo's interpretation would still govern the Court's construction of the term "truck tipper" because Logistec knew what Daewoo understood the term to mean. See Ga. Code Ann. § 13-2-4. In the fallout of Daewoo's discovery that Logistec had purchased a trailer-only tipper and not a non-detaching tipper, Vannelli confirmed several times that he—and thus Logistec—had understood that Daewoo always thought Logistec would be purchasing a non-detaching tipper. For example, Vannelli emailed Logistec's CEO in September 2012 and acknowledged that Daewoo

AO 72A
(Rev. 8/82)

had a "valid point" that "verbally we had always discussed a drive-through with no detachable cab."

Additionally, Georgia law requires courts to prefer, when construction is doubtful, that construction which "goes most strongly against the party executing the instrument or undertaking the obligation." Ga. Code. Ann. § 13-2-2(5). If any doubt remains as to what the parties intended the term "truck tipper" to mean after reviewing the evidence of their negotiations, the statutory guidelines direct the Court to construe the phrase "truck tipper" against Logistec, who was obligated to provide that machinery. Under § 13-2-2(5), then, Daewoo's proposed definition of "truck tipper" prevails.

Thus, the Court finds under Georgia Code Annotated §§ 13-2-2(5), 13-2-3, and 13-2-4 that Daewoo bargained for a tipper that did not require detaching the cab from the trailer, and that both parties understood that this type of tipper is what the term "truck tipper" in the Agreement referenced. Furthermore, Logistec was well aware that this was Daewoo's understanding. And even if it is unclear whether Daewoo bargained for the non-detachable tipper or if Logistec knew Daewoo's understanding of the term, the Court interprets the phrase against Logistec, who had the obligation of providing the tipper.

## B. Materiality of the Breach

Having concluded that Logistec breached the contract by providing a trailer-only tipper instead of a non-detaching tipper, the question becomes whether that breach is material.

Generally, a party injured by a breach of contract may elect to rescind the contract. Forsyth Cnty. v. Waterscape Servs., LLC, 694 S.E.2d 102, 111 (Ga. Ct. App. 2010). To justify rescission, "there must be a material nonperformance or breach by the opposing party." Id. "A breach is material when it is so substantial and fundamental as to defeat the object of the contract. . . . A breach which is incidental and subordinate to the main purpose of the contract does not warrant termination." Id. at 112. If the breach is not material, the non-breaching party cannot rescind the contract, but may seek damages. Id. at 111.

Here, Daewoo's principal reason for entering into the contract with Logistec was to export woodchips to its business partner in Turkey. The record reflects that there are issues of disputed fact as to whether Logistec's installation of a trailer-only tipper is a substantially material breach to "defeat the object of the contract."

Logistec has presented evidence that Daewoo, prior to rescinding the contract, never requested to test Logistec's trailer-only tipper to see if it could meet the volume and

AO 72A
(Rev. 8/82)

quantity demands of the Agreement. See Thuraisamy Dep. 160:13-161:20, 166:1-7. Furthermore, Daewoo did not have any personal knowledge regarding the operational capabilities of the tipper. Id. at 155:24-156:8, 160:13-61:20. No representative or agent of Daewoo knew whether the tipper would adequately perform to the contract. Logistec even went so far as to test the equipment itself, and found that, as of August 27, 2013, Logistec's equipment was still capable of performing the Agreement. Spivey Dep. pp. 47-79. Thus, Logistec has presented evidence that could reasonably persuade a juror that the non-conforming tipper could nevertheless satisfy the main goal of the Agreement, making Logistec's breach non-material.

Additionally, even without the Affidavit of Charles Bell, the record contains evidence that could support a finding for Daewoo's benefit that the breach was, in fact, material. Both parties, in emails leading up to the Agreement, expressed an aversion to having any kind of tipper other than one that tipped the whole truck. Before signing the Agreement, both parties apparently believed that the Agreement could only be efficiently executed with a tipper that did not require detachment. Thus, under the evidence more fully discussed in Part I.A.ii, a jury could reasonably find that Logistec's breach of the Agreement was material, and that Daewoo had the right to rescind the contract.

Because there is a disputed issue of material fact as to Count I of Logistec's claim, both parties' motions for summary judgment as to that claim are **DENIED**.

### III. Count II: Promissory Estoppel

Count II of Logistec's Complaint sets forth a cause of action for promissory estoppel. According to Georgia law:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Ga. Code Ann. § 13-3-44(a). "A promise is a manifestation of an intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Mooney v. Mooney, 538 S.E.2d 864, 868 (Ga. Ct. App. 2000)(quoting DPLM, Ltd. v. J.H. Harvey Co., 526 S.E.2d 409, 412 (Ga. Ct. App. 1999)).

Promissory estoppel provides that in certain occasions, reliance by a party upon the promise of another is "sufficient consideration, in and of itself, to render the executory promise enforceable against the promisor." Kemira, Inc. v. Williams Investigative & Sec. Serv., Inc., 450 S.E.2d 427, 431 (Ga. Ct. App. 1994). "However, reliance alone does not a promise make; there must be something approaching a meeting of the minds, or a mutual understanding that a promise is being made upon which the

AO 72A
(Rev. 8/82)

promisee may reasonably be expected to rely." <u>Foley Co. v.</u>
<u>Warren Eng'g., Inc.</u>, 804 F. Supp. 1540, 1546 (N.D. Ga. 1992).
Rather, under Georgia law, the Plaintiff must show that:

> (1) the defendant made a promise or promises; (2) the
> defendant should have reasonably expected the
> plaintiffs to rely on such promise; (3) the plaintiffs
> relied on such promise to their detriment; and (4) an
> injustice can only be avoided by the enforcement of
> the promise, because as a result of the reliance,
> plaintiffs changed their position to their detriment
> by surrendering, forgoing, or rendering a valuable
> right.

<u>Rental Equip. Group, LLC v. MACI, LLC</u>, 587 S.E.2d 364, 367 (Ga.
Ct. App. 2003).

The Eleventh Circuit has explained that promissory estoppel
has "no application unless the evidence is clear and convincing
and the terms of the promise are definite." <u>W. Indies Network-I,</u>
<u>LLC v. Nortel Networks, (CALA) Inc.</u>, 243 Fed. Appx. 482, 485
(11th Cir. 2007)(affirming district court's rejection of
promissory estoppel claim on summary judgment where alleged
promise to secure equity financing was not definite and
certain). "Promissory estoppel 'does not apply . . . to vague,
indefinite promises.'" <u>Jones v. White</u>, 717 S.E.2d 322, 329 (Ga.
Ct. App. 2011)(quoting <u>Mooney</u>, 538 S.E.2d at 868).

Logistec contends that Daewoo is liable under a promissory
estoppel theory based on "independent representations, omissions
and conduct toward Logistec after execution of the Agreement."
Dkt. no. 70, p. 24. Logistec says it relied upon such

AO 72A
(Rev. 8/82)

representations, omissions, and conduct in continuing to make capital expenditures to perform the Agreement "after DWI raised concerns regarding Logistec's truck tipper." Id. However, Logistec has not identified a promise sufficient to satisfy promissory estoppel. Rather, Logistec avers that Daewoo showed an "intent to deliver woodchips" and "affirmatively admitted" that Daewoo was in the negotiation stages with an alternate facility. Id. For a successful promissory estoppel claim, "while the promise need not meet the formal requirements of a contract, it must, nonetheless, have been communicated with sufficient particularity to enforce the commitment." Mooney, 538 S.E.2d at 868. Logistec has failed to show evidence of a promise communicated with sufficient particularity and definiteness to enforce commitment. Consequently, Daewoo's motion for summary judgment as to Logistec's promissory estoppel claim is **GRANTED**.

## IV.  Counts IV and V

In its complaint, Logistec also includes claims for breach of good faith and fair dealing (Count IV) and attorney's fees (Count V). Because these claims rely, in part, on the factual determination of whether Logistec's breach of the Agreement was a material breach, the Court declines to grant motions for summary judgment on these claims at this time.

## CONCLUSION

A question of material fact exists as to Count I of Logistec's claim against Daewoo, and both parties' motions for summary judgment are **DENIED** as to that claim. Additionally, parties' motions for summary judgment as to Counts IV and V are also **DENIED** at this time. Daewoo's motion for summary judgment on Count II is **GRANTED**. Logistec's motion to strike the testimony of Charles Bell is **GRANTED**.

**SO ORDERED**, this 30TH day of September, 2014.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)